No. 3     February 15, 2024     27

## IN THE SUPREME COURT OF THE STATE OF OREGON

Robert TREBELHORN,
*Petitioner on Review,*
*and*

ATTORNEY GENERAL,
*Judgment Creditor,*

*v.*

PRIME WIMBLEDON SPE, LLC,
a Delaware limited liability company;
and Prime Administration, LLC,
a Delaware Limited liability company,
dba Prime Group,
dba Wimbledon Square,
dba Wimbledon Square Apartments,
*Respondents on Review,*
*and*

Andrea SWENSON,
*Defendant.*
(CC 16CV40959) (CA A170010) (SC S069417)

On review from the Court of Appeals.*

Argued and submitted November 29, 2022.

Kathryn H. Clarke, Portland, argued the cause for petitioner on review. Mark McDougal, Kafoury & McDougal, Portland, filed the brief for petitioner on review. Also on the brief was Gregory Kafoury.

Raffi Melkonian, Wright Close & Barger, LLP, Houston, Texas, argued the cause for respondents on review. Matthew C. Casey, Bullivant Houser Bailey PC, Portland, filed the brief for respondents on review. Also on the brief were Jessica Z. Barger, Raffi Melkonian, and Brian J. Cathey, Wright Close & Barger, LLP, Houston, Texas.

_____

* Appeal from Multnomah County Circuit Court, Karin J. Immergut, Judge. 316 Or App 577, 500 P3d 675 (2021).

Kristian Roggendorf, The Zalkin Law Firm P.C., San Diego, California, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Flynn, Chief Justice, and Duncan, Garrett, James, and Masih, Justices, and Kistler and Balmer, Senior Judges, Justices pro tempore.**

FLYNN, C.J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

** Walters, J., retired December 31, 2022, and did not participate in the decision of this case. Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. DeHoog and Bushong, JJ., did not participate in the consideration or decision of this case.

**FLYNN, C.J.**

This case requires us to determine whether the jury assessed a "grossly excessive" amount of punitive damages, contrary to the prohibition of the Due Process Clause of the Fourteenth Amendment against arbitrary deprivations of liberty or property. Plaintiff suffered a serious knee injury at his apartment complex when his leg punched through a section of elevated walkway that had been weakened by dry rot. Defendants Prime Wimbledon SPE, LLC, and Prime Administration, LLC, who owned and managed the apartment complex, were aware that the walkway and other structures at the complex had deteriorated to the point that they required "life safety" repairs, but they had chosen not to repair the walkway on which plaintiff was injured. Plaintiff sued defendants for negligence and violation of Oregon's Residential Landlord-Tenant Act and prevailed. In addition to awarding plaintiff just under $300,000 in economic and noneconomic damages, the jury found that defendants' conduct justified imposing punitive damages of $10 million against each defendant.

On post-verdict review of the punitive damages verdict, the trial court concluded that the evidence permitted the jury to find defendants liable for some amount of punitive damages but that imposing $10 million in punitive damages would violate defendants' due process rights. The trial court also determined that the maximum amount of punitive damages that due process will permit on this record is nine times the amount of compensatory damages awarded by the jury and, accordingly, entered judgment for the reduced amount of just under $2.7 million in punitive damages against each defendant. On cross-appeals from the parties, the Court of Appeals agreed with all of the trial court's decisions and affirmed, and this court allowed review.

In briefing to this court, plaintiff argues that the jury's full amount of punitive damages must be reinstated, and defendants urge us to simply affirm the trial court's judgment for the reduced amount of $2.7 million in punitive damages against each defendant. Those arguments frame and narrow the scope of our inquiry. As we will explain,

the sole question that we answer is whether the trial court correctly concluded that the Due Process Clause precluded the court from entering judgment for the full amount of punitive damages found by the jury. We agree with the trial court that, on this record, $10 million in punitive damages would violate defendants' due process rights. Accordingly, we affirm the judgment of the trial court and the decision of the Court of Appeals.

## I.  BACKGROUND

We state the facts in the light most favorable to plaintiff because he was the prevailing party before the jury. *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or 526, 528, 246 P3d 1121 (2011). At the time of his injury, in February 2016, plaintiff was 47 years old. He lived an active lifestyle, working as a high school baseball coach and running an after-school sports program for children. He was living in an apartment complex owned and managed by defendants in Portland, Oregon. One night, plaintiff was walking across a second-story concrete walkway, connecting his apartment building to a parking structure, when a portion of the concrete gave way under his right foot, creating a hole in the walkway of approximately nine by 18 inches. Plaintiff's right leg dropped into the hole up to his thigh, and he landed in a sitting position on the walkway. His right knee was in pain, but he was able to lift himself out of the hole and notified apartment staff of the hazard.

The next day, plaintiff's knee remained in pain and was swollen. He went to the hospital and was instructed to return if the swelling did not go down. In the weeks that followed, the swelling did not go down, and the pain and weakness in plaintiff's knee prevented him from participating in his normal activities. After five weeks without improvement, plaintiff returned to the hospital. The doctor diagnosed plaintiff with an acute meniscus tear in his right knee, resulting from his fall at the apartment complex.

Plaintiff tried to improve his knee through physical therapy and activity modification. But nearly a year after the fall, his activities were still significantly limited by knee weakness and instability. He was not able to coach

as he previously had, by demonstrating to the kids how to perform certain actions, and he was no longer able to participate in many of the sports programs that he was tasked with running.

Plaintiff then underwent surgery to repair the injury to his knee, participated in physical therapy, and exercised his knee to improve strength and stability. By the time of trial, in May 2018, plaintiff had largely been able to return to his normal activities, but he still experienced lingering pain and weakness in his knee when engaging in more strenuous physical activities. His coaching career path had been disrupted. And, according to plaintiff's doctor, the surgery left plaintiff with an increased chance of developing arthritis in his knee.

Plaintiff sued defendants for negligence and violation of Oregon's residential landlord-tenant laws, and he sought economic damages of just over $45,000 plus noneconomic damages of $350,000. Plaintiff also obtained leave to amend his complaint to add a claim for punitive damages against each defendant in the amount of $10 million. *See* ORS 31.725 (describing process for pleading a request for punitive damages).

At trial, both defendants admitted that they had negligently maintained the walkway through which plaintiff fell and that they had violated the obligations of a landlord under the Residential Landlord-Tenant Act. Specifically, defendants admitted that they were negligent in failing to properly repair or replace cracked concrete on the walkway, in patching the walkway in a manner that was insufficient to withstand the weight of a pedestrian, and in failing to warn plaintiff of the defect in the walkway. Defendants, however, disputed the extent of damages that plaintiff suffered as a result of the incident and specifically denied the claim for punitive damages.

Before the case was submitted to the jury, defendants moved for dismissal of the claim for punitive damages, arguing that the evidence was insufficient to support a punitive damage award. By statute, punitive damages are unavailable "unless it is proven by clear and convincing evidence

that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." ORS 31.730(1). The trial court rejected defendants' arguments and denied their motion.

At the conclusion of trial, the jury was instructed on the proof required for it to award punitive damages and on how to determine the amount for each defendant, if it decided to award punitive damages. Those instructions included that the jury should consider "separately for each [d]efendant":

> "(a)   How reprehensible was that defendant's conduct, considering the nature of that conduct and the defendant's motive?
>
> "(b)   Is there a reasonable relationship between the amount of punitive damages and plaintiff's harm? [and]
>
> "(c)   In view of that defendant's financial condition, what amount is necessary to punish them and discourage future wrongful conduct?"

The jury also was instructed that it "may not punish a defendant merely because a defendant has substantial financial resources" and that it could "not award punitive damages to punish the defendant for harm caused to persons other than the plaintiff," but that evidence "of harm suffered by persons other than the plaintiff as a result of the defendant's conduct" could "be considered in evaluating the reprehensibility of defendant's conduct."

After deliberating, the jury found that defendants' conduct caused plaintiff to suffer $45,597.06 in economic damages for medical expenses (the full amount sought) and $250,000.00 in noneconomic damages for pain and emotional distress. The jury also found that plaintiff had proved that both defendants had engaged in conduct that met the statutory standard for punitive damages and awarded $10 million in punitive damages against each defendant.

Following the jury's verdict, defendants asked the trial court to reduce the jury's punitive damages award, arguing that the amount set by the jury was "grossly excessive"

and would violate defendants' rights under the Due Process Clause. The trial court agreed. The trial court concluded that, under the case law of this court and the United States Supreme Court, a punitive damages award that exceeds compensatory damages by a double-digit ratio will violate due process except in exceptional circumstances. Here, the amount of punitive damages that the jury assessed against each defendant was 33 times more than the amount that the jury found to be plaintiff's damages for the harm that he suffered, and the trial court concluded that the facts did not present the type of exceptional circumstances that would justify such a disparity. The trial court concluded that the maximum constitutionally permissible amount of punitive damages for each defendant on this record was nine times the actual damages awarded by the jury—$2,660,373.54— and, accordingly reduced the punitive damages against each defendant to that amount.

Plaintiff appealed the trial court's order reducing the punitive damages award, and defendants cross-appealed, arguing that the evidence was insufficient to support any amount of punitive damages. The Court of Appeals affirmed the trial court's judgment without opinion. *Trebelhorn v. Prime Wimbledon SPE, LLC*, 316 Or App 577, 500 P3d 675 (2021). Plaintiff filed a petition for review in this court, which we allowed.

## II.   ANALYSIS

As indicated above, plaintiff urges this court to conclude that the Due Process Clause requires *no* reduction of the punitive damages in this case. Pointing primarily to what he contends was extremely reprehensible conduct, plaintiff asks that we reinstate the $10 million in punitive damages that the jury assessed against each defendant. Plaintiff does not separately argue that, if due process requires a reduction of the punitive damages verdict, the trial court nevertheless reduced the award more than due process requires. And defendants simply urge us to affirm the reduced amount of punitive damages imposed by the trial court; in this court, they do not dispute that the evidence permitted the jury to award punitive damages, and they do not contend that the reduced amount imposed by

the trial court is constitutionally excessive given the record in this case. Thus, the single question before us is whether the trial court and Court of Appeals correctly concluded that $10 million in punitive damages exceeds the amount that the Due Process Clause permits in this case.[1]

The question of whether a jury's punitive damages award is constitutionally excessive is entirely governed by federal law because there is "no state law excessiveness challenge under the Oregon Constitution."[2] *Goddard v. Farmers Ins. Co.*, 344 Or 232, 256, 179 P3d 645 (2008) (internal quotation marks omitted). Indeed, under Oregon law, the jury's assessment of punitive damages is a determination of fact subject to the prohibition in Article VII (Amended), section 3 of the Oregon Constitution that "no fact tried by a jury shall be otherwise re-examined in any court of this state." *DeMendoza v. Huffman*, 334 Or 425, 447, 51 P3d 1232 (2002). That uniquely Oregon prohibition must yield, however, to the prohibition of the Due Process Clause of the Fourteenth Amendment against arbitrary deprivations of liberty or property. *Honda Motor Co. v. Oberg*, 512 US 415, 434-35, 114 S Ct 2331, 129 L Ed 2d 336 (1994). The Due Process Clause prohibits states from imposing "grossly excessive" punitive damages awards.[3] *State Farm Mut. Automobile Ins. Co. v.*

---

[1] In the course of responding to plaintiff's arguments, defendants suggest that the appropriate punitive damages amount for purposes of our due process analysis inquiry might be $20 million in punitive damages (combining the $10 million that the jury assessed against each defendant). But defendants do not develop a due process argument for that approach and, in any event, do not ask us to correct any aspect of the trial court's due process analysis. Thus, we assume that the trial court correctly framed the due process inquiry as whether $10 million in punitive damages against either defendant is constitutionally excessive given the record of harm that plaintiff suffered.

[2] Oregon statutes impose limits on the imposition of punitive damages that are not in dispute in this case. Specifically, ORS 31.730(1) provides that "[p]unitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." And ORS 31.735(1) provides that 70 percent of any assessment of punitive damages is payable to the Attorney General—60 percent "for deposit in the Criminal Injuries Compensation Account of the Department of Justice Crime Victims' Assistance Section" and 10 percent "for deposit in the State Court Facilities and Security Account."

[3] The Due Process Clause of the Fourteenth Amendment provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law."

*Campbell*, 538 US 408, 416, 123 S Ct 1513, 155 L Ed 2d 585 (2003).[4]

A.  *Framework and Standard of Review*

We have previously emphasized that "'[s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow,'" and the Due Process Clause permits states to impose punitive damages in amounts that are "'reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence.'" *Hamlin*, 349 Or at 533 (quoting *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996)). Thus, "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Hamlin*, 349 Or at 533 (quoting *Gore*, 517 US at 568).

There is no easy answer to whether a particular award of punitive damages is "grossly excessive." Indeed, the Supreme Court has repeatedly refused "to set any 'rigid benchmark' beyond which a punitive damages award becomes unconstitutional." *Hamlin*, 349 Or at 533 (citing *Campbell*, 538 US at 424-25 and *Gore*, 517 US at 582). Instead, the Supreme Court has required courts to consider three "guideposts" when reviewing whether a punitive damages award is "grossly excessive": "'(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity [or ratio] between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" *Id.* at 418 (citing *Gore*, 517 US at 575). And the Court has required appellate courts to consider those guideposts without any deference to the determinations of the trial court, in order to "ensure[] that an award of punitive damages is based upon an application of law, rather than a

---

[4] *Campbell* is the most recent Supreme Court decision to consider whether a punitive damages award was "grossly excessive" in violation of the Due Process Clause, but this court has subsequently examined that question on multiple occasions. Thus, we rely significantly on those more recent Oregon decisions to explain the governing law.

decisionmaker's caprice." *Campbell*, 538 US at 418 (internal quotation marks omitted).

In determining the factual predicate for the award of punitive damages, we view "the evidence in the record that is relevant to [the] award in the light most favorable to the party who won the award." *Goddard*, 344 Or at 261; *see also Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556, 17 P3d 473 (2001) (court views the historical facts "in the light most favorable to the jury's verdict if there is evidence in the record to support them"). But whether a particular punitive damages award is grossly excessive is a question that we resolve by employing "the applicable legal criteria (including the three *Gore* guideposts) to determine if, as a matter of law, the jury's punitive damages award is grossly excessive." *Goddard*, 344 Or at 263; *see also Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 437, 121 S Ct 1678, 149 L Ed 2d 674 (2001) (emphasizing that, under federal due process principles, "the level of punitive damages is not really a 'fact' 'tried' by the jury" (internal quotation marks omitted)). Thus, in determining whether a particular punitive damages award is grossly excessive, we "must in some sense reexamine the evidence in the record—not to redecide the historical facts as decided by the jury, but to decide where, for purposes of the [three] guideposts, the conduct at issue falls on the scale of conduct that does or might warrant imposition of punitive damages." *Goddard*, 344 Or at 262.

B.   *Guidepost Analysis*

Our analysis, therefore, is framed around the three guideposts that the Supreme Court has identified: reprehensibility, ratio, and civil penalties. We begin by assessing each guidepost separately, based on "the historical facts that a rational juror could find, based on the evidence in the record," and then consider the guideposts together in determining whether the punitive damages imposed by the jury was "grossly excessive." *See Goddard*, 344 Or at 262.

1.   *Reprehensibility guidepost*

The degree of reprehensibility of a defendant's conduct is "[t]he most important indicium of the reasonableness

of a punitive damages award." *Campbell*, 538 US at 419 (quoting *Gore*, 517 US at 575). The Supreme Court has specifically identified five factors to consider in assessing the degree of reprehensibility: whether "the harm caused was physical as opposed to economic; [whether] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* Before analyzing those reprehensibility factors, we describe the historical facts related to reprehensibility that a rational jury could find and the reasonable inferences that the jury could draw from that evidence.

a.   Historical facts related to reprehensibility

The hole that formed in the elevated walkway as plaintiff walked across it occurred because defendants had ignored the safety risks posed by the failing staircases and walkways at their property. The property consists of two adjacent apartment complexes known as Wimbledon Square and Wimbledon Gardens. The two complexes were built in the 1970s and, between them, consist of nearly 600 apartment units in 72 buildings that are two- to three-stories high.

The apartments above the first floor are accessed through exterior staircases and elevated walkways connecting the buildings. Those staircases and walkways were originally constructed by pouring concrete over untreated wooden posts and beams. Over the years, the concrete would settle and wear, leading to cracks that allowed water to enter those structures. The water rotted the untreated wooden posts and beams, compromising the structural integrity of the staircases and walkways, as well as the railings that are intended to prevent people from falling over the sides of the staircases and walkways.

Defendant Prime Wimbledon SPE, LLC, purchased Wimbledon Square in the early 2000s and, soon after, acquired Wimbledon Gardens. Prime Wimbledon SPE,

LLC, as the owner of the properties, contracted with defendant Prime Administration, which provides management services, to run the day-to-day operations at the properties, including maintenance. The maintenance staff had a yearly maintenance budget, but expenses of more than $5,000 required management approval. And larger maintenance projects would be budgeted annually by ownership and management.

The record contains no evidence prior to 2011 of whether defendants knew of potential risks posed by structurally compromised staircases, walkways, and handrails, or whether they took steps to address the structurally compromised conditions. In 2011, defendants brought in a contractor to submit bids to repair some of the staircases and walkways. That contractor later testified that many staircases and walkways needed immediate repair due to dry rot and that he had never seen dilapidation at that scale before. Although the contractor submitted bids, defendants did not hire him to repair the rotted structures.

Instead, defendants hired another contractor, Larsen, to replace a few landings in 2012 and 2013. Those projects revealed some rotted structures in the staircases, raising concerns among Prime Administration, employees that there was severe dry rot in similar structures throughout the property. Employees were concerned that, if the problems were not fixed, then someone could fall from a walkway or balcony and get seriously injured or die. Employees testified that Prime Administration's management was aware of the risks but did not take them seriously. For example, the onsite regional manager avoided a certain route to her office because it required crossing an uneven walkway that she joked might collapse. Prime Administration's chief operating officer joked that the property was so dilapidated that they should just burn it down.

Larsen assessed the entire property to identify needed repairs in 2014 and 2015, often accompanied by onsite maintenance staff and members of the upper management who were involved in developing the maintenance budget—namely, Prime Administration's vice president of capital and regional maintenance supervisor. According to

Larsen, "[t]here were a lot of areas that needed to be fixed, more than about any other property that I can recall looking at." He put together a spreadsheet consisting of hundreds of items that needed repairs, including about $750,000 in repairs to address "life safety" issues. According to Larsen, "life safety" issues referred to staircases, balconies, landings, railings, and elevated walkways that were structurally compromised because a collapse of those structures "would cause life-or-death injury." The items covered by the $750,000 proposal addressed only those structures that could be identified as compromised before beginning the repairs. Larsen was certain that they would discover more rotted areas by opening up the concrete.

One of the areas that Larsen specifically identified as needing repairs was the elevated walkway where plaintiff was later injured. Concrete on the walkway was visibly cracked, and there was an area of one- to two-inch depression—like a puddle in the concrete—that was covered with a skim-coat of patching material. Those changes to the concrete indicated that the structural components of the walkway had been compromised. Indeed, when the concrete was removed from that walkway after plaintiff's injury, it showed that the wood joists underneath were "very rotten" and had been "for quite some time." The joists were covered by plywood with the concrete on top, and the weight of the concrete pushing down had caused compression of the "soft, wet wood" below.

Identifying and restoring all the compromised staircases and walkways would require expenditures well beyond the normal maintenance budget, necessitating approval from both management and ownership. Larsen's proposal was sent to management and ownership as part of the 2015 budgeting process. But defendants rejected most of Larsen's proposed "life safety" repairs. Rather than spending the approximately $750,000 that Larsen recommended for repairs to resolve the "life safety" issues, defendants spent about $225,000 on "life safety" issues and spent another $225,000 on non-"life safety" issues, such as replacing trim and siding. The only reason defendants gave for

rejecting the proposal to address all "life safety" repairs was that the $750,000 cost "was too much."

Although Larsen was directed to replace some of the rotted structures, for others, he was directed to perform superficial repairs that he did not think were adequate to make the structures safe, such as fabricating brackets for the top of rotted posts that supported some walkways. That direction came from Prime Administration's vice president of capital. According to Larsen, those repairs were simply a "Band-Aid" that would provide support for "a year or two, maybe five. You never know." But, because the rot remained, it would continue to grow and eventually compromise the bracketed posts.

Other items identified as posing "life safety" risks did not even receive those superficial fixes. Prime Administration management instead directed staff to paint over rotted wood and rusted metal brackets supporting the staircases, walkways, and handrails. Although painting over rotted wood makes the wood appear to be in sound condition, it accelerates the rate of deterioration by trapping moisture inside the wood. The walkway where plaintiff was later injured was among the proposed "life safety" repairs that defendants did not make. The regional maintenance supervisor instructed onsite maintenance staff to put a skim coat of concrete over the crack in that walkway. That made the walkway look better, but it did nothing to address the structural deterioration that was causing the walkway to sag.

Maintenance staff stated that management consistently preferred putting cheap "Band-Aids" on a problem rather than fixing it, including after plaintiff's injury. Maintenance staff indicated that management did not provide them with the resources to properly fix problems. Instead of addressing the underlying safety risks, the regional manager directed leasing agents to take prospective tenants along certain pathways to avoid dilapidated areas. The onsite maintenance manager left shortly after plaintiff's injury because he was tired of "constantly having to fight to try to get things fixed between upper management." The next onsite maintenance manager encountered

the same resistance. He sent an email to management in March 2017 raising what he considered to be urgent safety concerns at the property—namely, a sagging elevated walkway that was pulling away from the building. He was reprimanded by the regional supervisor for making an email record of the safety problems. Later that year, the maintenance manager was a second victim of deteriorating conditions at the complex. Approximately a year after plaintiff's injury, the manager injured his back when a deteriorated concrete stair tread broke when he stepped on it.

In 2017, plaintiff described his injury to an acquaintance who worked as a fire code inspector. Concerned about potential fire code violations, the inspector examined the 58 buildings at Wimbledon Square. The inspector identified cracked concrete stairs, sagging elevated walkways, loose railings, and risers on staircases that were rusted or affixed to rotted wood. A maintenance staff member showed the fire inspector a rotted wooden beam that was supporting two stories of elevated walkways. The beam was so rotted that the staff person could push a pin through it. Each of those problems posed risks to tenants attempting to exit the property in an emergency. The fire inspector testified that he had never seen an occupied building in worse or more dangerous condition. The inspector cited defendants for code violations at each of the 58 buildings, requiring defendants to "repair loose or broken walkways, staircases, stairs, and railings in the exit path."

In preparation for trial, plaintiff hired a building code expert with 35 years' experience, who examined the property in 2018. When asked about the structural integrity of the staircases, railings, and elevated walkways, he testified:

> "This is probably the worst multifamily or occupancy building I have ever seen, as far as the means of egress go in regards to the stairs, the balconies. I just have not seen any worse. I have seen one small area as bad as many of the areas are in this case, but never a totality of dilapidation and rot that I've seen at this building's property."

He pointed to numerous examples of unsafe staircases and walkways, including unsafe conditions that resulted

from the cheap fixes that defendants had carried out. He cited many places where staff had painted over dry rot and rusted metal fasteners and said that it would take many years of neglect to accumulate the amount of dry rot and corrosion that he saw at the property. He testified that there was "imminent danger" in many places at the property, it was one of the "most dangerous" residential properties he had seen in commercial use, and he did not believe that it was "safe for occupancy."

b.   The degree of reprehensibility

According to plaintiff, we should conclude that defendants' conduct falls "at the extreme end" of each of the factors that the Supreme Court has instructed us to consider in assessing the reprehensibility of a defendants' conduct. We agree that the evidence permitted the jury to draw factual inferences favorable to plaintiff with respect to at least four of the factors: "the harm caused was physical as opposed to economic"; defendants' "conduct evinced an indifference to or a reckless disregard of the health or safety of others" and "involved repeated actions"; and the harm that plaintiff suffered "was the result of intentional malice, trickery, or deceit."[5] Moreover, viewing the historical facts in the light most favorable to plaintiff, a rational juror could draw reasonable inferences with respect to those factors that place the conduct of both defendants at the high end of reprehensible conduct that a state may punish. But, as we will explain, we are not persuaded by plaintiff's assertion that defendants' conduct falls at the "extreme end" of the range of reprehensible conduct that justifies punitive damages of the magnitude found by the jury.

There is no dispute that defendants caused plaintiff to suffer physical harm. And, given the jury instructions and verdict form, we know that the jury found that each defendant at least had "shown a reckless and outrageous indifference to a highly unreasonable risk of harm and ha[d]

---

[5] Plaintiff contends that defendants' tenants were financially vulnerable "because all were in low-income housing" and at risk of becoming homeless. Although defendants insist that no evidence supports those assertions, and we are inclined to agree, our assessment of reprehensibility does not ultimately turn on plaintiff's failure to identify the evidence that would permit a reasonable inference that defendants' tenants were financially vulnerable.

acted with a conscious indifference to the health, safety and welfare of others." *See* ORS 31.730 (describing statutory standard for recovery of punitive damages in a civil action). That statutory threshold for awarding *any* punitive damages describes conduct that is well onto the scale of reprehensible conduct that a state may punish. *See Campbell*, 538 US at 419 (explaining that whether conduct "evinced an indifference to *or* a reckless disregard of the health or safety of others" informs the degree of reprehensibility of that conduct (emphasis added)). And, viewing the historical facts in the light most favorable to plaintiff, a rational juror would have no difficulty finding that the conduct of both defendants rose to that level—as the trial court concluded.

Moreover, the jury could find that defendants were aware, for at least five years prior to plaintiff's injury, that structurally compromised stairs, balconies, and elevated walkways pervaded the complex and posed a risk of serious physical injury if not death to the tenants and others using the complex. The jury could find that defendants consciously rejected needed repairs to many of the deteriorated structures, including the walkway on which plaintiff was injured. And the jury could find that defendants' tortious conduct put at risk many hundreds of people who lived in the apartment complex over the years, in addition to those who visited, and caused actual injury to a second person after plaintiff was injured. In fact, the jury could find that defendants continued to reject performing other needed repairs for more than a year after plaintiff's injury, leading to a second injury. That actual and threatened harm to others is expressly relevant to our assessment of the degree to which defendants' conduct was reprehensible. *See Philip Morris USA v. Williams*, 549 US 346, 357, 127 S Ct 1057, 166 L Ed 2d 940 (2007) (emphasizing that, although "the Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation, * * * conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few" and that "a jury consequently may take this fact into account in determining reprehensibility"); *see also Williams v. Philip Morris, Inc.*, 340 Or 35, 55, 127 P3d 1165 (2006), *vac'd on other grounds*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007), *on remand*, 344 Or 45, 176 P3d 1255 (2008)

(explaining that the jury, "in assessing the reprehensibility of [the defendant's] actions, could consider evidence of similar harm to other Oregonians caused (or threatened) by the same conduct"). And the jury could further infer from that evidence that defendants' decision not to address the deterioration of the walkway on which plaintiff was injured was part of a repeated pattern.

A rational jury also could reasonably infer that the harm that plaintiff suffered "was the result of intentional malice, trickery, or deceit." From the evidence described above, the jury could find that defendants covered up defects to make the structures appear safe to current and prospective tenants even though they knew that the defects actually posed an unreasonable "life safety" risk. Indeed, according to one of defendants' maintenance supervisors, "fresh paint over rotting wood" was "the Wimbledon Way."

And a rational jury could find that defendants were motivated to disguise, rather than repair, the deterioration, because they put their profits ahead of the safety of the residents, believing that the misconduct would not be discovered. As the Supreme Court has emphasized, "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability." *Exxon Shipping Co. v. Baker*, 554 US 471, 494, 128 S Ct 2605, 171 L Ed 2d 570 (2008).

Finally, we highlight defendants' admission that the condition of its walkway violated the Oregon Residential Landlord-Tenant Act. *See* ORS 90.730(6)(a) (specifying that a "common area is considered unhabitable if it substantially lacks," among other things, "[b]uildings, grounds and appurtenances that are kept in every part safe for normal and reasonably foreseeable uses"). As we have previously concluded, "the Oregon legislature's affirmative action to protect qualitatively similar state interests permits us to consider defendant's statutory violation in our reprehensibility analysis." *Hamlin*, 349 Or at 541; *see also Gore*, 517 US at 576-77 (explaining that "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant

support for an argument that strong medicine is required to cure the defendant's disrespect for the law").

In sum, the evidence permitted the jury to draw reasonable inferences about defendants' conduct that suggest a high degree of reprehensibility. That conclusion "does not generate numerical answers at all, because the [reprehensibility] guidepost itself, and the 'subfactors' that go into it, are all qualitative, not quantitative." *Goddard*, 344 Or at 257. But we have emphasized that it can be helpful to "compare the level of reprehensibility exhibited in various cases, and that comparison may lead us to a conclusion that the constitutionally permissible limit in a particular case is 'high' or 'low,' relative to the limit in another case." *Id.* Thus, although the scale of reprehensible conduct is not exclusively defined by a comparison to past cases, those cases nonetheless provide useful guidance.

At the most extreme end of the range of reprehensible conduct exhibited by defendants in our punitive damages cases is the conduct of the cigarette manufacturer Philip Morris, which the jury in *Williams* found liable for the wrongful death of a smoker. In that case, the jury found $821,485.50 in economic and noneconomic damages, and this court affirmed a $79.5 million punitive damages award as constitutionally permissible based largely on the reprehensibility of the defendant's conduct. *Williams*, 340 Or at 44, 63-64. In upholding the amount as within constitutional limits, we emphasized that "there can be no dispute that [the defendant's] conduct was extraordinarily reprehensible." *Id.* at 55. As we described, the defendant "knew that smoking caused serious and sometimes fatal disease, but it nevertheless spread false or misleading information to suggest to the public that doubts remained about that issue." *Id.* The defendant had "engaged in a massive, continuous, near-half-century scheme to defraud the plaintiff and many others," even though it "always had reason to suspect—and for two or more decades absolutely knew—that the scheme was damaging the health of a very large group of Oregonians—the smoking public—and was killing a number of that group." 340 Or at 63; *see also id.* at 55 (noting that the defendant's

"deceit thus would, naturally and inevitably, lead to significant injury or death").[6]

For cases involving harm to a person, however, the exercise of comparing to other cases is of limited value, because *Williams* provides the only relevant reference point on the scale. Every other case from this court and every case from the Supreme Court has addressed reprehensibility in the context of conduct that caused only economic harm. Given the significance that the Court has placed on the distinction between reprehensible conduct that causes "physical as opposed to economic" harm, a comparison to those cases tells us that defendants' conduct was significantly more reprehensible and could justify a more significant amount of punitive damages. *See, e.g., Goddard,* 344 Or at 260 (emphasizing that "reprehensibility depends, to a large degree, on whether the harm caused was physical as opposed to economic" (internal quotation marks omitted)).

On the other hand, a comparison to *Williams* tells us that this case does not fall at the extreme end of reprehensible conduct for which the state may impose punitive damages. Two significant differences between the evidence here and the evidence in *Williams* require a conclusion that defendants' conduct is less reprehensible than the "extraordinarily reprehensible" conduct that allowed us to justify the award in *Williams*. First, although defendant's reprehensible conduct was more than an isolated occurrence, the earliest indication that defendants were aware of the need for "life safety" repairs was 2011—five years prior to plaintiff's injury. Second, although defendants acted with indifference to the risk of life-threatening harm to their tenants, there is no evidence that defendants' conduct had caused

---

[6] The Supreme Court later vacated our first *Williams* decision based on its concern that the jury may have punished the defendant for harm that its misconduct had caused to strangers to the litigation. *Philip Morris*, 549 US at 357. The Court explained that, although the jury may consider the risk of harm to others when determining the reprehensibility of the defendant's conduct, it may not *punish* the defendant for harm caused to others. *Id*. But the Court declined to consider whether the award in *Williams* was "grossly excessive." *Id*. at 358. And this court on remand adhered to its original decision. *Williams v. Philip Morris Inc.*, 344 Or 45, 61, 176 P3d 1255 (2008), *cert dismissed* 556 US 178 (2009). We therefore treat our reasoning and conclusions in our original *Williams* decision as approved of in the remand decision.

actual harm prior to plaintiff's injury and no evidence that it caused life-threatening harm at any point. Thus, the degree of reprehensibility in this case is not comparable to the "extraordinarily reprehensible" conduct of the defendant in *Williams*. *See* 340 Or at 63 (explaining that, "for two or more decades [the defendant] absolutely knew" that its reprehensible conduct "was damaging the health of a very large group of Oregonians—the smoking public—and was killing a number of that group"). As indicated above, however, the degree of reprehensibility is high and, accordingly, the constitutionally permissible amount of punitive damages also is high. *Goddard*, 344 Or at 259.

### 2.   *Ratio guidepost*

The next guidepost that the Supreme Court has directed us to consider is the "disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 US at 418. Although the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," *Gore*, 517 US at 582, the so-called "disparity," or "ratio," guidepost "comes closest to providing numerical limits." *Goddard*, 344 Or at 257. That is because the Supreme Court has, "at various times, alluded to specific numerical ratios" that provide a place to start. *Id*. at 257-58. For example, in one early case involving purely economic harm, the court concluded that a four-to-one ratio might be "'close to the line,' [but that] it did not 'cross the line into the area of constitutional impropriety.'" *Gore*, 517 US at 581 (quoting *Pacific Mutual Life Insurance Co. v. Haslip*, 499 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)). In another early case, the Court upheld an award of punitive damages where the "relevant ratio" between punitive damages and potential economic harm from the defendant's conduct "was not more than 10 to 1." *Id*. (describing *TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 462, 113 S Ct 2711, 125 L Ed 2d 366 (1993)). But the Court in *Gore* readily concluded that due process precluded the jury's finding of punitive damages that was "a breathtaking" 500 times greater than the fraudulently caused economic harm that the defendant caused by selling the plaintiff a new car without

disclosing that the car had been repainted. *Id*. at 583, 585-86. *Goddard* drew from those cases "a very general rule of thumb" that "the federal constitution prohibits any punitive damages award that significantly exceeds four times the amount of the injured party's compensatory damages, as long as the injuries caused by the defendant were economic, not physical." 344 Or at 260.

As indicated above, the Court has yet to consider a due process challenge to punitive damages in the context of reprehensible conduct that causes physical harm, but the Court has said that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 US at 425. The Court later characterized that holding of *Campbell* as meaning that "a single-digit maximum is appropriate in all but the most exceptional of cases," albeit in the context of deciding a case that did not turn on the due process limitation on an award of punitive damages. *Exxon Shipping*, 554 US at 514-15; *see Goddard*, 344 Or at 275 ("*Campbell* suggests that, except in extraordinary circumstances, a punitive damages award that is more than nine times the amount awarded in compensatory damages violates due process, no matter what the tort.").

That is the guidance that the trial court followed in this case. As noted above, the trial court concluded that $10 million in punitive damages was grossly excessive. The trial court arrived at that conclusion by comparing the amount of punitive damages that the jury imposed against each defendant to the actual damages that the jury awarded—a ratio of 33 to one—and determining that the facts did not present the type of exceptional circumstances to justify that disparity. The court concluded that, on this record, due process required the court to limit punitive damages to an amount nine times more than the damages that the jury awarded for plaintiff's actual harm.

Plaintiff contends that the court erred in calculating the ratio under the second guidepost because it failed to account for the potential harm to plaintiff. In argument to the trial court, plaintiff cited the testimony of Larsen—the contractor that defendants hired to make repairs in 2012

and 2013—as permitting an inference that the walkway on which plaintiff was injured, like the other walkways throughout the complex, had deteriorated to a condition that presented "life safety issues." He also insisted that there was no need for evidence of how he potentially could have suffered greater harm because "that's nothing for the jury to decide." Instead, he contended that "the Court is invited, in its wisdom, to take a look at how dangerous this thing was" and conclude that the potential harm could have included death or paralysis. In briefing to this court, plaintiff repeats his argument that the relevant ratio should reflect the potential "that plaintiff could easily have sustained catastrophic injuries from a fall through a second-story walkway." Citing appellate cases involving jury awards of "many millions of dollars" for catastrophic injuries, plaintiff urges this court to conclude that his "potential harm" falls in that range. And he emphasizes that a ratio that takes into account millions of dollars in potential harm would be "vastly reduced" compared to the ratio that the trial court calculated.

Defendants insist, however, that the trial court correctly compared the punitive damages only to the amount of compensatory damages that the jury actually awarded in this case. They contend that plaintiff "misconceives" the law of "potential harm" in seeking to compare punitive damages to harm from injuries that plaintiff "did not suffer at all (but could have)." Defendants also insist that, even if potential harm can be based on injuries that plaintiff did not actually suffer, potential harm must be based on the record, not merely what a reviewing court can conceive of. And the record here, they contend, requires us to reject plaintiff's potential harm argument because there was no jury finding or instruction on potential harm and no evidentiary basis for plaintiff's "catastrophic injury" theory of potential harm.

As we will explain, we agree with plaintiff that it generally is appropriate to compare the amount of punitive damages to the actual *and potential* harm to the plaintiff, even if that produces a number that is substantially greater than the amount of damages that the jury actually awarded. But we agree with defendant that the extent of potential harm to a plaintiff is a fact that must be based

on permissible inferences from the evidence. And potential harm must be closely related to the harm that actually occurred, rather than an alternative injury scenario that is merely conceivable. Ultimately, we also agree with defendants that, on this record, there is no basis to infer that the possibility of plaintiff suffering a catastrophic injury was more than merely a conceivable alternative scenario. For that reason, we conclude that the trial court did not err in using the jury's determination of actual damages to evaluate the ratio guidepost.

> a.   Potential harm in the ratio in general

Although short-hand descriptions of the ratio guidepost sometimes describe a comparison between the punitive damages and the "compensatory damages," which represent the actual harm to a plaintiff, the Supreme Court has repeatedly emphasized that the relevant constitutional comparison focuses on "the disparity between the *actual or potential harm* suffered by the plaintiff and the punitive damages award." *Campbell*, 538 US at 418 (emphasis added); *see also TXO*, 509 US at 460 (explaining that the Court had "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages" and that "[i]t is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded" (emphasis added)); *Hamlin*, 349 Or at 534 ("[T]he Supreme Court has suggested that reviewing courts may consider not only the compensatory damages awarded by the jury, but also the potential harm that could have resulted from the defendant's acts."). We emphasized in *Goddard* that, "[b]y permitting a punitive damages award to be a multiple of 'potential harm,' the Court [in *Campbell* and *Gore*] demonstrated that the punitive damages award is not limited to some multiple of the compensatory damages actually awarded by the trial court." 344 Or at 269.

Defendants, nevertheless, cite this court's decision in *Goddard* for the proposition that "the correct amount to use in calculating the maximum constitutionally permissible punitive damages award under Oregon law" is the amount of compensatory damages that the jury awarded

plaintiff. But our decision in *Williams* makes clear that, under Oregon law as well as under federal law, the amount of punitive damages can be compared to a plaintiff's "potential harm," not just the amount of compensatory damages actually awarded by the jury. There, we described *Gore*'s ratio guidepost as requiring the court to compare a "numerator" that "is fixed by the punitive damages award" to a "denominator" that includes "not only the harm actually suffered by [the] plaintiff, but also the potential harm to [the] plaintiff."[7] 340 Or at 60. And in considering the size of the ratio, we observed that the plaintiff's decedent had died "shortly after being diagnosed with cancer" and that, had he lived longer, his "economic damages could easily have been 10 or more times the amount awarded." *Id.*

   *Goddard*, on which defendants rely, did not change that principle, although we recognize the potential confusion. In *Goddard*, the jury awarded $20 million in punitive damages against an insurance company that had failed to settle a wrongful death action against its insured. The plaintiff argued that the punitive damages were not "grossly excessive" if compared to what the plaintiff understood to be "potential harm"—the amount of damages that the complaint in the underlying wrongful death action had *alleged* against the insured driver. This court rejected that view of "potential harm" and announced, without elaboration, that the concept of potential harm "has nothing to do with the amount that a jury *could* conceivably have awarded to plaintiff." 344 Or at 268 (emphasis in original). "Rather," this court emphasized, "the actual and potential harm suffered by a plaintiff is a fact to be decided by the jury." *Id.* at 268-69.

   Defendants rely on *Goddard*'s reference to what a jury "*could* conceivably have awarded" as meaning that the ratio must compare the amount of punitive damages found by the jury to the amount of compensatory damages that the same jury actually awarded for the plaintiff's actual harm. But in context, our reference in *Goddard* to what "a jury *could* conceivably have awarded" was a reference to the

---

[7] As a mathematical concept, "numerator" and "denominator" generally refer to the terms of a fraction. Although a ratio is sometimes expressed as a fraction, we will refer to the relevant components as the "first term" (punitive damages) and the "second term" (actual or potential harm) of the ratio.

jury in the underlying wrongful death action, which was the source of the harm for which the plaintiff sought damages against the insurer. And, although unexplained, our statement that the amount alleged in the wrongful death case was simply the amount that the jury in that case "*could* conceivably have awarded*" reflects the long-established rule that the relevance of the amount alleged as damages in a complaint is to provide notice to the defendant of the maximum amount that could conceivably be awarded. *See* ORCP 67 C ("A judgment for relief different in kind from or exceeding the amount prayed for in the pleadings may not be rendered unless reasonable notice and opportunity to be heard are given to any party against whom the judgment is to be entered."). Because "the actual and potential harm suffered by a plaintiff is a fact to be decided by the jury," like all facts, "potential harm" must be based on more than the mere assertions of counsel in a pleading. Thus, we disagree with defendants here that the jury's actual award of compensatory damages is "the correct amount to use in calculating the maximum constitutionally permissible punitive damages award under Oregon law."

  b.    Potential harm as a fact

*Goddard*, however, presents a problem for plaintiff for a different reason. As we emphasized, "the actual and potential harm suffered by a plaintiff is a fact to be decided by the jury." 344 Or at 268-69. Identifying potential harm as a fact to be decided by the jury means that the reviewing court is limited to considering the potential harm "that a rational juror could find, based on the evidence in the record." *Id.* at 262; *see also id.* at 263 (describing the applicable standard of review for predicate facts relevant to the three constitutionally prescribed guideposts). Consistent with that principle, in the two cases in which this court or the Supreme Court has upheld a punitive damages award based on "potential harm," the evidence of what actually occurred as a result of the wrongful conduct permitted a reasonable inference that the harm to the plaintiff could have been much worse.

The Supreme Court applied the concept of "potential harm" in affirming the award of punitive damages

in *TXO*. There, the litigation involved allegations that TXO was attempting to interfere with Alliance Resources Corporation's (Alliance) oil and gas development rights. Alliance brought a slander of title claim to prevent the interference from succeeding, and the jury found in favor of Alliance, awarding $19,000 in compensatory damages and $10 million in punitive damages. 509 US at 450-51. Although the punitive damages award was 526 times greater than the actual compensatory damages award, the Court nevertheless rejected TXO's constitutional challenge to the punitive damages award. *Id.* at 459, 462.

A plurality of the Court specifically relied on the potential harm that might have resulted had TXO succeeded in its effort to deprive the plaintiff of development rights. *Id.* at 462. After considering the parties' arguments about evidence in the record, including the full value of the rights with which TXO attempted to interfere, a plurality of the court reasoned that "the jury could well have believed" that the amount potentially at stake was multiple millions of dollars. *Id.* at 461. As the plurality opinion explains, "[w]hile petitioner stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to respondents, in terms of reduced or eliminated royalties payments, had petitioner succeeded in its illicit scheme." *Id.* at 462.[8] Considering that potential harm, the plurality concluded that "the disparity between the punitive award and the potential harm" did not "jar one's constitutional sensibilities." *Id.* (internal quotation marks omitted).

This court's decision in *Williams* offers another example of a record that provided a basis for including potential harm in the ratio that we consider under the second guidepost. 340 Or at 60. In *Williams*, after emphasizing that *Campbell*'s ratio takes into account "not only the harm actually suffered by [the] plaintiff, but also the potential harm

---

[8] At trial, Alliance had introduced evidence that "the anticipated gross revenues from oil and gas development—and therefore the amount of royalties that TXO sought to renegotiate—were substantial." 509 US at 450; *see also id.* at 450 n 10 (describing the detailed evidentiary record that Alliance created to support its calculation of the size of the income stream for TXO if it succeeded in its effort to acquire Alliance's development rights).

to [the] plaintiff," we reasoned that the "economic damages
could easily have been 10 or more times" the amount of eco-
nomic damages that the plaintiff actually suffered had the
decedent "lived long enough to incur substantial medical
bills." *Id*. In explaining that statement, we pointed to evi-
dence that the decedent had "died shortly after being diag-
nosed with cancer"—the disease caused by the defendant's
wrongful conduct—and evidence of the amount of economic
damages incurred during the six months that the decedent
had lived. *Id*.

Thus, both *TXO* and *Williams* illustrate ways in
which evidence of the actual wrongful conduct and the
actual resulting harm support using a ratio that takes into
account potentially greater harm that the defendant's con-
duct could have caused to the plaintiff. In other words, both
cases illustrate applications of our holding in *Goddard* that
"the actual and potential harm suffered by a plaintiff is a
fact to be decided by the jury." *See* 344 Or at 268-69. And we
do not question that holding. But neither *TXO* nor *Williams*
supports defendant's suggestion that there must be an
express jury finding on "potential harm," because neither
*TXO* nor *Williams* relied on an express jury finding regard-
ing potential harm.[9]

    c.   Conceptual limits on what counts as "potential
       harm"

The evidence of potentially greater harm to which
plaintiff has pointed is the testimony from the contrac-
tor who repaired other walkways that had deteriorated to
the point that they were at risk of collapsing and causing
life-threatening injuries. We agree with plaintiff that the
evidence permits an inference that the walkway on which
plaintiff was injured also was deteriorated to the point that

---

[9] The jury in this case was instructed that, in determining the amount of
punitive damages, it was to consider whether there was "a reasonable relation-
ship between the amount of punitive damages and the plaintiff's harm." Although
defendants insist that plaintiff's "potential harm" argument must fail because
the jury was not specifically instructed to consider "potential harm," the concept
arguably was included within the unqualified reference to "plaintiff's harm" in
the given instruction. Because we ultimately conclude that plaintiff's argument
fails for other reasons, we leave for another day questions about the extent to
which either party must request a jury instruction on "potential harm."

it was capable of collapsing and causing catastrophic injury. But defendants insist that plaintiff's theory of catastrophic harm relies on an alternative injury scenario that is too different from what actually occurred to constitute "potential harm" for purposes of the ratio guidepost. We are persuaded by defendants' argument.

Although neither *TXO* nor *Williams* defines "potential harm" or articulates a limitation on what the concept includes, those and other cases make clear that there are limitations. The first is that the ratio takes into account only the potential harm *to the plaintiff*. Although harm (or threatened harm) to others is relevant in assessing the reprehensibility of a defendant's wrongful conduct, we emphasized in *Williams* "that harm to others should not be considered as part of the ratio guidepost." 340 Or at 61 (citing *Campbell*, 538 US at 426-27). Considering potential harm in the context of what actually occurred keeps the focus on how the defendant's wrongful conduct has affected the plaintiff.

Another important limitation is described by our emphasis in *Goddard* that the concept of potential harm "has nothing to do with" harm that the plaintiff "conceivably" could have incurred. We recognize that the line between "potential harm" and harm that is merely conceivable could be more clear. But both *TXO* and *Williams* illustrate potential harm that was more than merely conceivable. Those cases, thus, offer some guidance regarding what the conceptual limit means. In both cases, the wrongful conduct set in motion a chain of events that resulted in the actual harm to the plaintiff—in *TXO*, conduct to cause the plaintiff to lose development rights and, in *Williams*, conduct that caused the decedent to smoke and develop lung cancer. And in both cases, those actual events could have ended in far greater harm to the plaintiff. As this court reasoned in *Williams*, the decedent's early death meant that "[o]nly chance saved [the defendant] from" being liable for a much greater amount of economic damages. 340 Or at 60.

In later describing *TXO*, the Supreme Court assigned a label to the relationship between the actual events and the potential harm, which informs our understanding of what we may consider to be "potential harm." According to the

Court in *Gore*, *TXO* endorses a ratio standard that considers the "relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." 517 US at 581 (emphasis in original; internal quotation marks omitted).

We do not understand the Court, in describing potential harm as harm likely to result from the defendant's conduct, to mean that the potential harm must have been *more likely than not* to result. Nothing in *TXO*'s discussion of the potential harm to the plaintiff, if the defendant's attempted plan had succeeded, can be understood to suggest that the defendant's success was more likely than the actual result. But *Gore* directs us to understand "potential harm" as "likely" under the circumstances.

The nature of the ratio guidepost suggests a related conceptual limitation on harm that was "likely to result from the defendant's conduct." As we discussed above, the ratio of punitive damages to actual and potential harm is a significant indicator of whether the jury has found an amount of punitive damages that is a constitutionally permissible punishment. 372 Or at 46-47. The ratio "comes closest to providing numerical limits," *Goddard*, 344 Or at 257, and as a practical matter, the ratio can easily be dispositive of the due process inquiry. *See Campbell*, 538 US at 425. But that significance is easily lost if the size of the ratio can be too easily modified, such as by substituting alternative injury scenarios that are too remote from what actually occurred to the plaintiff as a result of the defendant's wrongful conduct.

To some extent, every consideration of "potential harm" involves the proposition "if _____ had happened, then plaintiff's harm could have been greater." Contrasting *Williams* and *TXO* with *Goddard* tells us that, if the variables that must be inserted to complete the proposition are too attenuated from the evidence of what actually happened, then the alternative harm is merely conceivable.

d. Application

That guidance persuades us that the possibility of catastrophic injury that plaintiff identifies does not qualify as "potential harm." The evidence of what actually occurred

is that a portion of a second-story walkway gave way under plaintiff's right foot. Plaintiff describes the incident as his foot "puncturing through" the walkway. And the record documents a hole of approximately nine by 18 inches that was open to the ground below and into which plaintiff's leg slid up to his thigh. The extent to which plaintiff suffered actual harm as a result of that incident is established by the jury's findings regarding compensatory damages. And defendants contend that the record permits no inference that catastrophic injury, and much greater potential harm, was a likely result. We agree with defendants that the evidence of what actually occurred does not permit a reasonable inference that plaintiff could have, instead, suffered catastrophic injury.

It is possible to add variables to the "if _____ had happened" proposition to create a scenario under which plaintiff could have suffered a catastrophic injury. For example, if the hole had been big enough for his body to fall through, if—instead of punching through a hole—plaintiff's weight had triggered collapse of one of the cross-beams supporting a large section of the walkway, or if plaintiff had fallen sideways toward the railing and the railing collapsed under his weight, then plaintiff could have suffered a catastrophic injury. But those scenarios are not what actually happened to cause plaintiff's injury. Larsen's testimony, to which plaintiff pointed, may have permitted an inference that the wooden structures supporting the concrete had deteriorated to such a degree that the walkway posed a risk of collapsing under the weight of a person walking across it, and causing catastrophic injury. There is no evidence, however, that the catastrophic injury scenario that Larsen described was any more likely to occur to plaintiff on the night that his foot punched through the concrete than to any other person walking across at any other time. And that generic risk of catastrophic injury, if the walkway had failed in an entirely different way than it failed on the night that plaintiff was injured, depends on the kind of reasoning that we rejected in *Goddard*. It depends on an alternative scenario that is conceivable but too remote from the evidence of what actually happened for us to count it as "potential harm" under the ratio guidepost.

We in no way discount the risk of catastrophic harm that defendants' conduct presented or the actual physical and emotional harm that plaintiff experienced when his foot punched through the walkway. But those are considerations that the jury addresses in awarding actual damages and in assessing the reprehensibility of the defendant's conduct. Thus, we understand that something different is meant by the "potential harm" that we may use in calculating the ratio. On this record, the trial court did not err in concluding that there was no basis for adding catastrophic "potential harm" to the ratio.

### 3.  *Comparable sanctions guidepost*

The final guidepost instructs courts to consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 US at 418. As this court has previously noted, "comparable sanctions suggest a legislative determination about what constitutes an appropriate sanction for the conduct" and "may give a defendant fair notice of the penalties that the conduct may carry." *Williams*, 340 Or at 57. In assessing comparable sanctions, we look at the "relative severity of the comparable sanctions" to determine the seriousness of the misconduct. *Id.* at 58. "The guidepost may militate against a significant punitive damage award if the state's comparable sanctions are mild, trivial, or nonexistent. However, the guidepost will support a more significant punitive damage award when the state's comparable sanctions are severe." *Id.*

Plaintiff primarily relies on evidence from the fire inspector, who testified that he had the ability to "shut down" an apartment complex if he determined that the condition was "imminently dangerous" but that he generally does not exercise that authority because doing so at a complex like Wimbledon Square "would immediately displace hundreds of families." Given the 600 rental units at the complex, with an average rent of $1,250, plaintiff argues that the "shutdown sanction would presumably result in many millions of dollars of lost rents." Defendants do not dispute that a fire inspector has the authority to "shut down" an "imminently dangerous" apartment complex, and we agree with plaintiff

that the record permits factual inferences from which to conclude that regulatory action to address the dangerous condition could have cost defendants many millions of dollars of lost rents.

Although that consequence is not technically a penalty for wrongful conduct, defendant also acknowledges that the City of Portland could impose monthly enforcement fees, totaling $643 per unit, for violating Portland's property maintenance regulations. Although defendant argues that such a penalty militates against a significant punitive damages award, we disagree. A fee of $643 per unit multiplied by 600 units easily could add up to multiple millions of dollars. We therefore conclude that the "comparable sanctions are severe" and support a significant punitive damages award. *See Williams*, 340 Or at 58.

C.   *Final Considerations*

Our final task is to determine, in light of the three guideposts and other applicable legal criteria, whether the $10 million in punitive damages that the jury assessed against each defendant is grossly excessive in this case as a matter of law. *See Goddard*, 344 Or at 262-63 (describing that inquiry). We have concluded that two of the guideposts that govern our due process review of the punitive damages in this case—reprehensibility and comparable civil sanctions—support a significant punitive damages award. But the amount of punitive damages that the jury assessed against each defendant exceeds the approximately $300,000 in actual compensatory damages by a ratio of 33:1. And we have concluded that there is no evidentiary basis for increasing the second term of the ratio by inferring significantly greater "potential harm" to plaintiff, so the relevant ratio of punitive damages to the harm to plaintiff remains 33:1. That disparity is dramatically greater than the "single-digit ratio" that the Supreme Court has suggested is—"except in extraordinary circumstances"—the limit of what due process will permit, "no matter what the tort." *Id*. at 275 (describing *Campbell*, 538 US at 425). Despite our observation above that the Supreme Court's general pronouncements about proportionality limits has never been tested by a case involving wrongful harm to a person, the caution

best reflects that Court's view of the due process limits on a state's interest in punishing and deterring reprehensible conduct. Thus, as we acknowledged in *Goddard*, the second guidepost "suggests that due process normally will not permit a punitive damages award in excess of a single-digit ratio." 344 Or at 259.

The qualifier regarding the ratio that due process "normally will not permit," of course, allows that there are limited exceptions. *See id*. at 260-61 (allowing that, higher ratios "might be appropriate in unusual circumstances"). *Goddard* catalogs the "few narrow circumstances" in which the Supreme Court or this court has held that due process does not preclude a greater disparity in the magnitude of punitive damage to harm: "(1) when a particularly egregious act causes only a small amount of economic injury; (2) when the injury is hard to detect; (3) when it is difficult to place a monetary value on noneconomic harms; and (4) when 'extraordinarily reprehensible' conduct—roughly comparable to the defendant's conduct in *Williams*—is involved." *Id*. at 270. The four examples described in *Goddard* share a common theme that, in those circumstances, limiting punitive damages to a single-digit ratio would "risk interfering with legitimate state interests by striking down awards that are reasonably calculated to deter and punish illegal conduct and that are, therefore, constitutionally permitted." *Hamlin*, 349 Or at 537.

The purpose of such examples is "to caution against the categorical use of ratios," not "to set forth an exclusive list of exceptions to a ratio requirement." *Id*. at 535. But plaintiff's justification for imposing $10 million in punitive damages against each defendant falls within the fourth category that we identified in *Goddard*. Plaintiff insists that due process permits the unusually great disparity in this case between the amount of punitive damages and the harm to plaintiff, because it serves the state's legitimate interest in deterring and punishing wrongful conduct that easily could have gone undiscovered or unpunished. According to plaintiff, defendants engaged in the "egregious" misconduct of choosing not to pay for "life safety" repairs having "every reason to believe that their conduct would never be subject

to any significant sanctions whatsoever"—because the witnesses who came forward had "nothing to gain and everything to lose from" bringing defendants misconduct to light.

Plaintiff is correct that deterring such misconduct is part of the state's legitimate interest in imposing punitive damages in civil cases. *See Hamlin*, 349 Or at 533. And, as described above, an inference that defendants were motivated to disguise, rather than repair, the deterioration in part because they believed that the misconduct would not be discovered and punished "represents an enhanced degree of punishable culpability." *See Exxon*, 554 US at 494. Indeed, we pointed to that inference in concluding that defendants' wrongful conduct demonstrates a high degree of reprehensibility. 372 Or at 43-44. But we have also concluded that defendants highly reprehensible conduct was, nevertheless, not comparable to the "'extraordinarily reprehensible' conduct on the part of the defendant" in *Williams*. Thus, we are not persuaded that the evidence in this case permits the kind of inferences that "may provide a basis for overriding" our due process concerns that arise from the jury's assessment of punitive damages that exceed the damages for harm to plaintiff by a ratio of 33:1. *See Goddard*, 344 Or at 258.

Although we do not rule out the possibility that some amount greater than (or less than) a nine-to-one ratio might be the maximum constitutionally permitted award in a case like this, neither party has challenged the trial court's determination that $2.7 million in punitive damages against each defendant is the correct reduced amount. Their arguments presented the single question of whether $10 million in punitive damages exceeds the amount that the Due Process Clause permits in this case, and we have answered that question.[10] Accordingly, we affirm.

---

[10] We recognize that, in *Goddard*, we described the methodology for performing a due process review in a way that arguably suggests a court must always determine the maximum constitutionally permitted amount of punitive damages. *See* 344 Or at 261-62 (explaining that, "[i]f the court determines that the award *is* grossly excessive, it then uses the same guideposts to determine the highest lawful amount of punitive damages that a rational juror could award, consistent with the Due Process Clause"). And we reiterate, to the extent that a court determines that due process requires any reduction to a jury's punitive damages verdict—an act that is otherwise prohibited by the Oregon Constitution—the court must give effect to both constitutional provisions by entering judgment

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

for a reduced amount that is not lower than the reduction that due process requires. *See Parrott*, 331 Or at 556 (explaining that "the federal requirement of judicial review for excessiveness directly conflicts with the re-examination clause of Article VII (Amended), section 3, of the Oregon Constitution"). But, as *Goddard* describes, that is a separate determination the court must make. We reviewed that determination in *Goddard*, because we were presented with arguments that challenged both to the trial court's determination that the jury's punitive damages verdict was grossly excessive (by the plaintiff) and the trial court's determination of the reduced amount that was the maximum amount permitted by due process (by defendant). *Id*. at 251. Here, neither party has argued that, if the court correctly determined that the jury's punitive damages were grossly excessive, the court nevertheless incorrectly determined that $2.7 million is the maximum, reduced amount of punitive damages that due process permits, and we decline to take up that question unilaterally.